Morning. We kept you waiting a little bit in the waiting room. I've not had that experience, but I hope it wasn't too delayed. This is our second argument of the morning. Sabre Industries v. Module X. We'll hear first from Mr. McMichael. Good morning, Your Honor. May it please the court. I represent the appellants and the cross appellees, Module X Systems, which we'll refer to as MXS, and the succession of Steve Schoonover. This case involves the interpretation and activities of both parties under joint venture agreement that they signed in April of 2014. On and before 2014, Sabre Industries manufactured concrete shelters, principally utilized in the telecommunications industry. MXS was formed by Mr. Schoonover in order to enter into the joint venture agreement, so that MXS would manufacture shelters for Sabre, because Sabre, as it had told MXS, anticipated that it was going to receive orders for concrete shelters beyond its capacity to manufacture them, principally from AT&T and Verizon for their telecommunications business. MXS was founded by Steve Schoonover in 2014, specifically in order to enter into the joint venture agreement and manufacture concrete shelters for Sabre. Mr. Schoonover had had a long and successful... Mr. McMichael, it's your argument, but we're familiar with the facts. You might want to get to your issues. Okay. Primarily, Your Honor, my issue begins with the pretrial ruling of Judge Hicks, in which he ruled in favor of judgment that MXS had breached the joint venture agreement by failing to pay a sum due to Sabre for the manufacture of certain concrete shelters for Allied Fiber. Allied Fiber project originally was a project that was a possibility under the joint venture agreement. Sabre had decided that it did not want to manufacture the shelters for Allied Fiber and declined that project. MXS, by that time, because of Sabre's failure to perform under the work, and so it made its own deal with Allied Fiber to provide five concrete shelters for them. Now, MXS admits that it did not pay Sabre for the work that Sabre did on the Allied Fiber project, but the argument is that the Allied Fiber project, as engaged in by MXS, was outside the scope of the joint venture agreement. Under the joint venture agreement, the customers were Sabre customers. Sabre got the orders. Sabre sent the orders to MXS. MXS did the on the particular project for the shelters. This was different. This was MXS's customer. This was billed directly by MXS to Allied Fiber. Allied Fiber paid MXS directly, and Sabre was to remit a certain amount of those funds to Sabre so that it would be paid for the work that it did on the project. Mr. Michael, among the things that occurred in the district court on this was the effort for you, your client, to show this. There was the statement relied on by your friend on the other side. When Mr. Shonova was asked about this, well, not about this specifically, he was asked about a spreadsheet that had been provided. I've looked at that spreadsheet. He said everything on it was covered by the joint venture agreement. On it is an Allied Fiber client customer is mentioned. I'm not quite sure what to make of the notes that follow where it's actually talking about these shelters. Could you explain why the way the district court handled this in light of Mr. Shonova agreeing that everything on there was covered by the joint venture agreement, why that doesn't sort of say the district court was right in not allowing you to pursue this other late approach? Yes, sir. Well, the list that was referred to in Mr. Shonova's deposition was a list of potential business under the joint venture agreement at a time before the Allied Fiber project had been rejected by SABRE and picked up later by MXS. So at the time... It seems to me, counsel, that this issue of whether Allied was inside or the project was inside or outside the joint venture agreement, it's certainly central now. I don't know if it's central at the time of the point. The time to have made it was at that time, either to correct on cross examination or whatever it might have been, Mr. Shonova acknowledging that everything on there was joint venture. It just seems sort of late in the day. Is there something on the spreadsheet itself that supports your point? Is the description of what the project was with Allied Fiber, which refers to second segment of a seven-segment ring circling whatever else it says, does that help you at all? Well, it does, your honor. But if you'll notice, the Allied Fiber project that is listed on the spreadsheet is a 28-shelter project. And the spreadsheet was MXS picked it up as an extra. The actual project was a five-shelter project that MXS undertook for Allied Fiber after SABRE declined to do the project. And the details of the project, that is the fact that this was MXS's customer directly, billed directly, paid for directly outside the scope of what had been agreed to in joint venture agreement, is evidence that this was outside the scope. And Mr. Shonova's affidavit filed in response and in opposition to the motion for summary judgment makes that clear, that this was outside the scope. And the important point is not that whether or not Module X owed the money, but whether or not this finding of breach that we contend is in error triggered the attorney's fees clause in section five of the joint venture agreement. And again, the judge instructed the jury prior to the trial being commenced that the parties agreed that MXS had failed to pay this amount owed to SABRE, but otherwise both parties denied that they had breached the agreement. So, in effect, he was telling the jury that MXS had breached the agreement before the trial ever began. That was consistent with his partial summary judgment ruling. I'm sorry? That was consistent with his partial summary judgment awarded SABRE. It was entirely consistent. And we suggest that that caused the jury to determine in its interrogatories that MXS had breached, they awarded the exact amount of money that the judge had determined that MXS owed. My understanding is the jury awarded $423 and the judge had awarded like $570. Well, we had agreed before the trial that there were some credits that MXS was entitled to, and that ultimately the amount owed to SABRE by MXS for the Allied Fiber project was the $423. Counselor, your time is two-thirds gone. Obviously, this is a significant issue because of attorney's fees, but let me move you on. We have your briefing beyond that. How was the issue at trial handled as to what the provision on the contract, how to interpret the provision on the contract that talks about the obligation, not obligation, you may not prejudge it, that Module X had the right to terminate the agreement with a 60-day notice if SABRE hadn't provided 75 shelters every three months. It seems to me there's some interpretation, potentially interpretation issue of the contract. I didn't see anything in the jury instructions or in the verdict form that actually said one way or another, if your client had to, I guess, rely on that before they could say that SABRE had been in breach by not providing 75 shelters, orders for 75 shelters. How was the interpretation of that handled at trial? What was the jury told? I argued to the jury that the notice provision, the written notice provision, provided MXS with the right to terminate the agreement. I understand that. I'm not talking about that. I mean, this is a legal question, it seems to me. What is the meaning of this contract? If the meaning is ambiguous, then maybe it's a jury issue. Did the judge just let this be argued by you and by opposing counsel without any instructions to the jury? It seems to me part of the argument by your friend on the other side is that once the jury found that you were in, that whatever default they had, by your failure to invoke this provision, the default was basically waived. Is that a fair characterization of the other point of view? That's what the other point of view was, your honor. But the jury, the judge never made any decision about what the contract meant, did he? Did not. And I don't know that the jury ever made any specific decision about that. So they were just, they had the provision and so they had to make their own determination about if they even considered it, about what this meant, correct? Correct. But again, our argument was that the written notice didn't affect whether or not Sabre was in default or had breached the agreement. It clearly had, if you look at Exhibit 135 and the number of shelters that it provided in that first six months period. But rather it would have given MXS the right to terminate the agreement, which it did not want to do because of all the money it had spent to prepare itself to perform under the agreement. Okay, counsel, let me ask you about the $2 million plus in damages. An awful lot of evidence was given to the jury. I think you may have had some document, though I haven't seen it yet, it's referred to in closing argument that maybe broke down what your damages were, but it was $15 million, $18 million, whatever it was. And they give $2 million and some change, that is not coincidentally the amount for contract that you were seeking. Where are we on that? It seems to me the jury was announcing that it was relying on your claim for contract to award delictual damages. I don't see much in the case law that either side has provided to us as to what we do with that, but it does seem to me that the jury at least made an error, but they also had evidence of much more damages than that that would be relevant for tort. So where are we? What do you have that would support using something that to me is clearly the contract claim, but upholding it for tort? Well, I think it's clear that that's where the jury got that figure. Right. It was from our experts' calculation of the lost profits up to the point where... Well, it's acceptance. That's where it came from. So where are we? Because they said there was no breach of contract. Well, where we are and from our standpoint is that there was ample evidence of damage beyond the contract. Right. Understood. But isn't that still an error that they have used a figure that has specific relevance to contract? Well, it does have relevance to the contract, but I'm not sure it's error in the sense that there was evidence that would support an award of $2.15 million or $5 million or $15 million. There was evidence, and as the trial judge ruled, it was odd and it may have suggested misunderstanding by the jury, but they were charged with coming up with a number that would compensate MXS for the damages it had incurred for the negligent misrepresentation. And while it's an unfortunate coincidence that they picked the number our expert had given for lost profits, there's plenty of evidence that would support that award or higher. Well, I would disagree with your word coincidence. I don't think it's a coincidence. I think it's a mistake, but maybe it's one that won't undermine the result. We'll have to wait and see. All right. Mr. Kennedy, you're up. Thank you, your honors. Again, may it please the court, my name is Robert Kennedy. Am I getting feedback? I am on this end. I'm not hearing anything out of order. I hope you're doing all right, Mr. Kennedy. Okay, good. I represent Saber Industries Incorporated. I'm going to spend most of my 20 minutes addressing the issues raised in Saber's cross appeal, but I'm happy to answer any questions that the court has about Saber's position regarding MXS's appeal issues. On what I was just talking to Mr. McMichael about, what do we do? You may argue that none of the evidence supports tort damages. That's fine. We can hear that. But this question of when the jury, I think, fairly clearly has picked a number that is not, that is for an award that they ended up rejecting, which is contract breach. And what sort of case law would allow us, that directs us on how to deal with that? Well, the authorities are clear that you cannot award contract damages for a delictual claim. Okay, so move beyond that, though. There's more than $2 million worth of evidence. Maybe, let's just say that there is evidence of more than $2 million, and you can deal later with why that evidence should be rejected. But that was before the jury of more than $2 million worth of delictual damages. But the jury chose contract damage amount. Why can't we just uphold it? Because there's evidence of more than $2 million of tort damages. Because they didn't, they considered these tort damages, and it's obvious they rejected all of them. And for whatever reason, the jury decided they wanted to award them excess something. I don't know why we can't figure that out, because they concluded that Sabre had not breached the contract. But they, but they clearly, as you and Mr. McMichael said, they clearly awarded the jury the contract damages figure. The fact that it is within the range of possible tort damages is irrelevant. Because, I mean, you know, if they had awarded $2 million or $4 million, I wouldn't have much of an argument, I don't think, because that was within the range. But the fact that they picked that specific number means that they were awarding contract damages for a tort claim, which you can't do. And I think if, I think that claim has to be sent back and retried. I don't know. Or, or maybe the judge, the court just rejects that, that award altogether. Would somebody else ask? I was about to ask one. Were there instructions given on tort damages? There were general instructions. Nothing specific to this point. But, but there was general tort damages instructions given to the jury, as there was contract, general contract. And those tort damages instructions weren't given over any objection by Sabre? No, your honor. All right. What happened after the verdict came in? Did the judge send the jury back to the jury room and wait for some sort of discussion among the judge, among the counsel, as to whether they had any objections? How did it play out after this came in, after the verdict form was shown to everyone? Well, of course, the verdict was read. The jury, I don't, I know that we polled the jury on the, on the verdict. And then what had happened, we had filed or, or, or made motions for Rule 50 arguments that the judge deferred until after the jury ruled. And it came back with the verdict because he didn't, he didn't want to interfere with, with the jury's timetable on that. And, and so after that came back, there was arguments on the party's Rule 50 motions, which were all then re-urged in writing after that point. I guess my premise for my question, or the reason for my question, is were you given an opportunity to note the inconsistency in the verdict? No liability for contract breach, liability for delictual breach or whatever it'd be called, tort damages. But then this, this improper, maybe, I don't know, award. Did you have a chance to see that? Jury was still there. The jury could have been sent out again to deal with that. Did you have some opportunity to review the verdict for him before the jury was dismissed? Well, we had, we had an opportunity to review the jury form, but we did not have an opportunity to object and to ask the jury to go back and re-deliberate. Okay. You can proceed. Um, one of the, one of the points I wanted to make was with respect to the court's preliminary instruction to the jury, where there was the discussion about the fact that MXS had breached the, the agreement. That came directly from a proposed preliminary statement submitted by the parties. And that's in the record at pages 2029 through 2032. The, I want to jump straight to this issue on damages, because I think that's, but we have three arguments on damages. One, obviously contract damages are not recoverable for a claim of negligent misrepresentation. That evidence of MXS's contract damages were different from MXS's tort damages, and I'll talk a little bit about that. And then this jury award was clearly tort damages, but on contract damages, those were spoken to by MXS's expert, Mr. Woods. And all he addressed was the contract damages. He did not address any of the tort damages whatsoever. And as the court will find when they review, he came up with three possible numbers. One was a $6,119,799 number. One was a $4,287,699 number. And the other was a $2,150,211 number. That $2,150,211 number was a number used by the jury. But there was no testimony whatsoever that that amount of damage came or was the result of any statement or misrepresentation made by Sandor or anyone at Sabre. Now, when you get to the tort damages, on the tort damages, Mr. Schoonover and Jeanne Loftin, who was the director of finance, she testified, they testified about the tort damages. Mr. Schoonover talked about a $5 million number he had to pay to a company called Hallwood. He talked about a $2 million number that he ended up having to pay to get the rights to the building. He talked about a $1.4 million number for a new building. He talked about a $1.4 to $1.5 million number to clean up the building. And he talked about a $2.4 million number to develop an integration system. Now, Mr. Schoonover testified he had $15 million in tort damages. Ms. Loftin testified that he had $17,600,000. So one of the numbers makes sense. Mr. Schoonover's number of $15 million is significantly different from Loftin's number of $17,600,000. And when you add up the component parts, you only get to $12.2 million or $12.3 million. So none of this made sense. That's why I believe the jury just disregarded all of it. And you can't even take one or two components of these numbers and add up to the exact... Mr. Kennedy, I haven't tried a lawsuit in over 30 years, but I'm remembering an exact example of an action. We tried and asked for about $17 million. The jury gave us $3 million. So I don't know that there's got to be some specific amount in evidence that the jury has to adopt. They have a huge amount of discretion on damages. I just don't see... I can't follow you on this. Well, certainly on general damages, they do. But when you just happen to pick out the same number that was the contract damages that you're supposedly awarding for some economic damage, there was no general damage suffered by Sabre. I mean, by MXL. I suppose you could argue that for a misrepresentation, court of misrepresentation, that it does have some correlation to contract damages, because the misrepresentation, as I understand the briefs, was what got Module to join the joint venture. Well, and some of their claims for negligent misrepresentation statements are, you told me, and Mr. Scudero said, I wouldn't have signed the JV agreement if I didn't do that. Now, that may give a rise to a rescission claim, but it doesn't give... or it may give rise to a breach of contract, but it doesn't give rise to negligent misrepresentation. You can't use a negligent misrepresentation tort to expand your contract claims. And the case... well, there's not a lot of cases on it, because again, the problem is this case is unique, where you had a breach of contract claim and a negligent misrepresentation claim tried together with separate damages, and even the plaintiff's expert testified. I'm not talking... I'm not testifying about the tort damages. I'm just talking about the contract damages. But it's only in these cases where you've got both of these claims being tried together that you have the risk and the opportunity for them to get conflated, so to speak, so that the jury is finding a tort, but awarding the contract damages. And that's why this case presents such a unique opportunity for the court to recognize this... well, it's not really... it is a jurisprudential rule in a sense, but it's also supported by the secondary authorities, and to make clear that we're not going to award contract damages for a tort claim. And that's clearly what happened here. You can't look at this number... Mr. Kennedy, were special interrogatories submitted to the jury at the time they were given their instructions? Yes, sir. But did you just use general verdict forms? No, we had a special jury verdict form that identified contract damages and separated from that tort damages. And so with regard to tort damages, they were free to put in any amount they wanted to put in, I guess. When you ask about tort damages, if they were awarding tort damages, they had to put it on a tort damages verdict form. Yes, sir. The amount it had to go on a tort damages verdict form. Yes, sir. And they could put any number between, as Mr. McMichael would say, zero and $17,600,000. And so why wouldn't it be reasonable to conclude that if they wrote something in the tort damages form, it was tort, whatever the number. It was for tort damages. Because in this case, you can't look at that specific exact number, that precise number, and think out of $17,600,000 numbers they could have selected, they picked that one. But we can't say they didn't know it was for tort damages because it was on a tort damages verdict form. Right? That's correct. But what we can say is that they made a mistake. And they erred by awarding contract damages for a tort. And which all the authorities say you cannot do. Counsel, let me, we certainly have your briefing on further elaboration on that Let me ask you about one of module's arguments, which I asked Mr. McMichael about, which is how this language in the joint venture agreement was handled for the jury. It does seem to me that whether Module X took the approach that's allowed on the joint venture agreement of giving notice and certain period of time to cure and whatever else, which is written in terms that will give them the right to terminate. Will that apply to whether your client breached at all if they don't exercise that right, if Module X does not exercise that right? That seems to me to be a legal question about what the contract meant. Give me your take on what the jury, what guidance the jury was given as to how to read this. Because they did find, despite all this and despite finding $2 million worth of damages, so they must have thought your client did something wrong. They still found no contract breach on your part. And I'm wondering if that's based on the argument that because Module X didn't exercise this provision, their remedy under this provision, that was clean any possible breach on the part of your client. So if that's the way the contract is interpreted, I want to know what would have given the jury any guidance on that reasoning. My recollection, and I'll have to go back, but is that the jury instructions provided basic contract instructions. I think we cited those provisions in the jury instructions. As far as the judge specifically saying, this is how you are to read this provision, that was not given. And then it was between Mr. McMichael and myself to argue that provision. And of course, the jury had that JV agreement as an exhibit. And so we used it, that exhibit in that language, and we argued it before the jury in our closing arguments. There was also testimony on by the parties about how they applied that provision and whether or not they followed that provision, and if they did or didn't, why they didn't. But to answer your question, I think is did the judge tell the jury exactly how to read this provision? And the answer to that is no, sir, your honor, they did not. We're in the jury instructions as a fairly lengthy one, number 17, that talks about breach of contract and does not address the point that I'm raising, which I think was part of your argument though, from my reading of the transcript. That's how you argued this to the jury and would explain to me why they thought your client was in substantial default in some way or at least had not upheld your end of the bargain with Module X, but still found no breach of contract. Well, you've got three minutes left, why don't you tell us what else you have you want us to focus on. There were two arguments in answer to yours. One is that MXS did not provide notice. They didn't provide SABRE an opportunity to cure. Therefore, SABRE was never in default of that agreement. And that's one of the things we argued in closing and throughout trial. The other was that the breaches of MXS preceded the breach of SABRE. And the way the contract was set up, you had a three-month period where SABRE was supposed to give MXS 75 units, 75 of these shelters. For the first three-month period, it's clear we met that goal. That was from May to July, May, June, and July. August, September, October, there's a question about whether or not we met that. We probably didn't. But, so our breach, if we had a breach, would have occurred in October. MXS would have had to have provided us notice and opportunity they never did that. But in the meantime, MXS breached the agreement in August by failing to pay us for some other materials that they had purchased from us. And so I think that's, that would have been the jury's thought process there. Mr. Kennedy, on the dispute about attorneys' fees awarded your client. Yes. Touch on the vast disparity between the hours SABRE's attorneys billed and the hours billed by Module. Well, especially after SABRE had won a summary judgment about five or six months before the trial. We heard that, but we never really got the evidence of that. I mean, we submitted all of our bills in a, I think it's 130 pages of detailed, you know, what we did on that particular day for this particular project. We cut a good bit of that time. We also segregated that time. And MXS says, well, that's a whole lot more than we spent, but they never told us what they spent. And they never told us how many hours they spent. So I really can't respond to that. I recall seeing a figure either in the judge's ruling, but I was just struck by the fact that you had received a partial summary judgment on the breach of contract and which was decided by summary judgment, as I've said, and yet you got a whole lot of deference from the judge on these, you know, interconnected or common facts or something that you had developed in discovery. That just seems out of bounds. Well, well, they had, you know, we had, I think it was almost three years of discovery in this case. There were 30 depositions taken. There was over 100,000 pages of documents produced. We did get a partial summary judgment. But in addition to that, at trial, we had to defend against MXS's claims. We had to defend against their affirmative defenses. We had the timing issue on who breached first. And then a lot of this, as the court can see, even though you want to say that's a negligent misrepresentation, but they're relying on a lot of stuff related to the All right, Mr. Kennedy. Thank you, Your Honor. Mr. McMichael. Your Honor, on the issue of attorney speaks, SABRE presented seven claims to the jury. The only claim that they were successful on was the already decided claim that MXS had breached, which was the subject of the summary judgment, partial summary judgment ruling that the judge had made. All the other claims that it made were rejected. Some of those were breach of contract claims. Some of those were tort claims. It also had a negligent misrepresentation and fraud and an intentional misrepresentation claim. So the jury rejected everything that SABRE did at trial except the ruling that the judge had given them before trial. SABRE, in its submission, said we spent 134 hours on the breach of contract claim, yet they claimed and were awarded attorney's fees on 4,500 hours of work. And it seems to me that they did a poor job, if they did at all, of segregating the time that they spent on issues other than MXS's breach versus the other matters in the case. Mr. Kennedy said he was unsure of what evidence there was of showing how many hours your attorneys put in on this. I thought there was something in the record indicating several thousand hours, but maybe 60 percent of the number of hours that... We submitted affidavits. You can move on from that. You've got not much time. With regard to the damages for negligent misrepresentation, the case law is clear that economic damages are available for negligent misrepresentation claims. And I would cite the court to the case of Ethel Court v. Gulf States that's discussed in our point. Ethel sued Gulf States for incorrect statements it made during contract negotiations about its power needs in the future. Ethel relied on those statements and, as a result, built a power plant specifically to address and service Gulf States' needs for power. It turned out that those projections were wrong, that Gulf States didn't need the power that would be generated by the plant. Ethel had to dismantle the plant and sued for their economic damages as a result of negligent misrepresentation. The court held that the decision that Ethel made to build the plant was predicated on these incorrect statements made during contract negotiations, and the court affirmed the jury award of over $4 million. So it's clear that in a negligent misrepresentation case, economic damages are available to a successful plant. And to Judge Gray's point, we can't get inside the minds of the jurors to know how they came up with a $2.1 million number, but he's correct. It was in a special jury interrogatory that said, do you think that Saber was guilty of misrepresentation? If so, how much was in excess damaged? And there was ample evidence that Mr. Schoonover spent millions of dollars to acquire and refurbish the manufacturing facility, to hire employees, all the costs that he incurred to get ready to prepare for performance under the joint venture agreement. The judge had already ruled that contract damages would be limited to lost profits, and so that any other damages, economic damages, would have necessarily have been dealt with in the tort side of the equation, and I think that's what the jury did, and I think the judgment was correct and ought to be upheld. Well, of course, he did find in his ruling on their post-verdict Rule 50B motion that it was odd. Odd? Yes, something along that line. Well, and I can't disagree. Really unusual or something of that nature. Right. I can't disagree, but there's ample evidence to support that award aside from the lost profits. In fact, he said it's somewhat peculiar. Well, I would have to agree. Well, we get peculiar things in appeals from time to time. Thank you both. Interesting case. Obviously, it was of considerable importance to your clients, but your oral argument has helped us. Thank you. Thank you. Thank you, Your Honor.